STATE OF NORTH CAROLINA v. RICKY DAN PERRY

No. 1

(Filed 6 November 1979)

1. **Criminal Law § 89.3— admissibility of prior consistent statements**

Prior consistent statements of a witness in North Carolina are admissible as corroborative evidence even when the witness has not been impeached, and failure of the trial court to instruct that the evidence was admitted for corroborative purposes only is not reversible error when the defendant has not requested such a limiting instruction.

2. **Criminal Law § 75.7— statements while in officer's car—no custodial interrogation**

Inculpatory statements made by defendant to a detective while defendant was in the detective's automobile did not result from custodial interrogation and were admissible in defendant's murder and rape trial though defendant had not been given the *Miranda* warnings where the police were investigating a routine missing person report; defendant was visited by one plain-clothes detective in an unmarked car at defendant's place of work; the police did not know a crime had been committed; defendant voluntarily entered the car and immediately gave an inculpatory statement; at that point, the detective ceased all questioning and took defendant to the station where he was given the *Miranda* warnings; and defendant was allowed to leave after posting bond on an unrelated charge, since at no point until defendant made his inculpatory statement would a reasonable person have believed that his freedom of movement was restrained in any significant way so that he was "in custody."

3. **Criminal Law § 68; Rape § 4— comparison of hairs—expert testimony—probative value**

Testimony by an FBI agent certified as an expert in the field of microscopic analysis of human hair that hairs found on a rape and murder victim's sweater were blond head hairs from a Caucasian which had microscopic characteristics similar to head hairs taken from defendant was not rendered inadmissible as having no probative value by the agent's testimony on cross-

examination that, although the hairs were similar, the number of characteristics they shared was "limited," when such testimony is considered with other evidence linking defendant with the crimes, including evidence which placed defendant in the victim's presence at the time she disappeared, evidence that defendant's gun was the murder weapon, and evidence that someone with defendant's blood type raped the victim.

**4. Rape § 3— indictment—insufficiency to charge first degree rape**
    An indictment was insufficient to charge first degree rape where it failed to allege that defendant was older than sixteen or that the defendant used a deadly weapon or inflicted serious bodily injury; however, the indictment was sufficient to support a conviction of second degree rape.

    Justice BROCK took no part in the consideration or decision of this case.

DEFENDANT appeals from judgment of *Lee, Judge,* entered at 31 May 1977 Session of DURHAM County Superior Court.

Defendant was indicted in Durham County for first degree murder, first degree rape, kidnapping and crime against nature in April, 1977.

At trial, State's evidence tended to show that Nana Louise Smith, a 24-year-old married college student, was last seen alive about 5:00 p.m. on Thursday, 10 March 1977, in the vicinity of South Alston Avenue near Hopson Road in Durham County. Her car had broken down and two boys, aged 10 and 13, had ridden their bikes over to see if they could help. They introduced Mrs. Smith to defendant, a gas station attendant they both knew, when he stopped several minutes later. The boys testified that defendant offered to give Mrs. Smith a ride to a phone or to a gas station. After Mrs. Smith got into the car, the boys saw defendant's car go up Alston Avenue then return some 15 minutes later going the opposite direction toward Hopson Road with Mrs. Smith still inside. Over objection, the State introduced prior written statements the boys had made to the police.

When Mrs. Smith failed to return home that evening, her husband went searching for her and found only the car with emergency lights flashing. He reported her missing.

A. W. Clayton, a detective for the Durham County Sheriff's Department, testified that he investigated the missing person report filed on Mrs. Smith. The day after Mrs. Smith's disappearance, Detective Clayton queried one of the two boys and

learned that the defendant had given her a ride in his car. Detective Clayton went to the gas station where defendant worked and asked defendant if he would sit inside the detective's car to talk. The car was unmarked and Detective Clayton was not wearing a uniform.

Defendant voluntarily entered the car, sat in the front passenger seat and closed the door. On *voir dire* examination, Officer Clayton testified that at the time he went to see defendant he did not know a crime had been committed and did not consider defendant a suspect of anything. He did not, therefore, give defendant any *Miranda* warnings.

While in the car, defendant denied ever having seen Mrs. Smith or ever having given her a ride the day before. Becoming suspicious at this denial, Detective Clayton took defendant to the Durham County Sheriff's Office where a routine "safety" frisk of defendant revealed a loaded .22 caliber pistol. Detective Clayton arrested defendant for carrying a concealed weapon and read him his *Miranda* warnings. After signing a waiver, defendant first maintained that he had never seen Mrs. Smith, then said he had given her a lift to a phone booth outside a local grill but had left her there.

Defendant was released on $100.00 bond for the concealed weapon charge and his gun was confiscated. The following day, Mrs. Smith's body was found in a wooded area off Hopson Road. She had been raped and shot four times, twice in the head and twice in the back with a small caliber pistol. Either wound to the head or one of the wounds to the back would have been fatal. There were sperm present in her mouth.

Bullets recovered from Mrs. Smith's chest cavity had been fired from the pistol confiscated from defendant. Sperm present in Mrs. Smith's body was from a blood type O-secretor. Neither Mrs. Smith nor her husband had that blood type; defendant did.

Over objection, the State presented the testimony of an F.B.I. agent that a hair recovered from Mrs. Smith's sweater came from a Caucasian and was similar in its characteristics to a hair sample taken from the defendant.

The State further produced the testimony of a fellow prisoner of the defendant's who testified that the defendant had admitted, while in jail, raping and shooting Mrs. Smith.

Defendant presented testimony of a friend that he had been at the friend's house from 4:30 p.m. until shortly before 5:00 p.m. on the day of Mrs. Smith's disappearance.

The jury returned with verdicts of guilty of first degree murder, first degree rape, kidnapping and crime against nature. Defendant was sentenced to two consecutive life terms for murder and rape and a 30-year term for kidnapping. A 10-year sentence for crime against nature was imposed to run concurrently with the 30-year term for kidnapping.

Time for appeal of right pursuant to G.S. 7A-27(a) having lapsed, this Court granted defendant's petition for certiorari on the judgments imposing life sentences. On 9 May 1979, we also allowed defendant's motion to bypass the Court of Appeals from the sentences imposed for kidnapping and crime against nature.

*Attorney General Rufus L. Edmisten by Special Deputy Attorney General Dennis P. Myers for the State.*

*John G. McCormick for defendant appellant.*

CARLTON, Justice.

Defendant presents four arguments on this appeal. We find one of his assertions has merit and remand for sentencing.

[1] Defendant first asserts that it was prejudicial error for the trial judge to admit the prior written statements of the two boys since their credibility had not been impeached. This is particularly prejudicial, he argues, when no instructions were given to the jury limiting the use of those statements to corroboration of their in-court testimony. Defendant conceded on oral argument that the boys' written statements were substantially the same as their in-court testimony.

Unlike the law in many other states, prior consistent statements of a witness in North Carolina are admissible as corroborative evidence even when that witness has not been impeached. *State v. Best,* 280 N.C. 413, 419, 186 S.E. 2d 1 (1972); *State v. Rose,* 270 N.C. 406, 154 S.E. 2d 492 (1967). Failure of a

trial court to instruct that the evidence was admitted for corroborative purposes only is not reversible error when the defendant has not requested such a limiting instruction. *State v. Bryant*, 282 N.C. 92, 191 S.E. 2d 745, *cert. denied*, 410 U.S. 987, 93 S.Ct. 1516, 36 L.Ed. 2d 184 (1973), and cases cited therein. Here, defendant's counsel objected generally to the admissibility of the statements but failed to request a limiting instruction. This assignment of error is overruled.

[2] Defendant secondly asserts that the trial judge erred in failing to suppress defendant's inculpatory statements made to Detective A. W. Clayton while defendant was in the detective's automobile. Defendant argues that this questioning amounted to a custodial interrogation which was conducted without warning him of his right to remain silent or his right to counsel in violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed. 2d 694 (1966).

At trial, the judge held a lengthy *voir dire* hearing on the admissibility of defendant's statements. At the conclusion of the hearing he found as a fact that, *inter alia*, the police were not aware a crime had been committed when they first questioned defendant. The trial court then concluded that defendant had not been subjected to *custodial* interrogation.

It is well established that statements obtained as a result of custodial interrogation without the *Miranda* warnings are inadmissible. *Miranda v. Arizona, supra*; *State v. Biggs*, 292 N.C. 328, 233 S.E. 2d 512 (1977); 2 Stansbury N.C. Evidence § 184 at 72 (Brandis rev. ed. 1973) and cases cited therein. Such warnings are not required, however, when questioning occurs while defendant is not in custody. *Miranda v. Arizona, supra*; *State v. Biggs, supra*; *State v. Sykes*, 285 N.C. 202, 203 S.E. 2d 849 (1974). The articulated test for custodial interrogations is whether questioning was "initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda v. Arizona, supra* at 444, 86 S.Ct. at 1612, 16 L.Ed. 2d at 706; *Oregon v. Mathiason*, 429 U.S. 492, 494, 97 S.Ct. 711, 713, 50 L.Ed. 2d 714, 719 (1977) (per curiam); *State v. Martin*, 294 N.C. 702, 707, 242 S.E. 2d 762, 765 (1978).

Courts have grappled with the question whether this test should be objectively applied and involve determining whether a

reasonable person would believe under the circumstances that he was free to leave, or whether it should be subjectively applied and involve determining whether the defendant believed, even unreasonably, that his freedom of movement was significantly restricted. *See* Note: Custodial Interrogation after *Oregon v. Mathiason*, 1978 Duke L. J. 1497 (1979). Most have adopted an objective test, focusing in their determination on "something . . . said or done by authorities, either in their manner of approach or tone or extent of questionings, which indicates that they would not have heeded a request to depart or to allow the suspect to do so." *U.S. v. Hall*, 421 F. 2d 540 (2d Cir. 1969), *cert. denied*, 397 U.S. 990, 90 S.Ct. 1123, 25 L.Ed. 2d 398 (1970). *See also State v. Hatton*, 116 Ariz. 142, 568 P. 2d 1040 (1977); *People v. Arnold*, 66 Cal. 2d 438, 449, 426 P. 2d 515, 522, 58 Cal. Rptr. 115, 122 (1967); *Myers v. State*, 3 Md. App. 534, 240 A. 2d 288 (1968); *People v. P.*, 21 N.Y. 2d 1, 233 N.E. 2d 255, 286 N.Y.S. 2d 225 (1967); *Commonwealth v. Brown*, 473 Pa. 562, 375 A. 2d 1260 (1977). *Cf., People v. Yukl*, 25 N.Y. 2d 585, 589, 256 N.E. 2d 172, 174, 307 N.Y.S. 2d 857, 860 (1969), *cert. denied*, 400 U.S. 851 (1970) (belief of a reasonable innocent person).

The United States Supreme Court itself has used an objective rather than a subjective application of the *Miranda* test in *Oregon v. Mathiason, supra*. There, defendant, a suspect in a burglary case, was asked to meet a police officer at a state parole office to answer some questions. In holding that this was not a custodial interrogation mandating *Miranda* warnings, the Court focused on three time frames — events occurring *prior* to the questionings, including the fact that the defendant had voluntarily appeared in response to a written request; events happening *during* the questioning, including the fact that defendant was told at the outset he was not under arrest but that he was a suspect; and events taking place *after* the questioning, including the fact that defendant was allowed to leave the parole office unhindered even though he had confessed to the burglary. At least one state court has echoed this objective three factor analysis. *See Hunter v. State*, 596 P. 2d 23 (Alaska 1979).

Although this Court has not previously articulated an objective test of custodial interrogation, we have to all practical purposes applied such a standard in our consideration of the question in the past.

In *State v. Martin*, 294 N.C. 702, 242 S.E. 2d 762 (1978) police had gone to a home to question a suspect who, it turned out, was not there at the time. Encountering instead the defendant, they asked if he would talk with them. He agreed, and explained the original suspect's role in the murder while he sat in the police car. After being advised he was a witness, he was taken to City Hall where he made a statement. At the end of the statement, he involved himself as an active participant in the crime. He was immediately given his *Miranda* warnings but was allowed to leave. We held such investigative questioning was not custodial interrogation, citing *Oregon v. Mathiason, supra*, and reasoning that "all the evidence shows that defendant . . . was not under arrest and his freedom to depart was not restricted." *State v. Martin, supra* at 707, 242 S.E. 2d at 765.

In *State v. Biggs*, 292 N.C. 328, 233 S.E. 2d 512 (1977), police went to the defendant's home and asked him to help them search for deceased who was believed to have been knifed. Police asked defendant if he had been to deceased's house, and when he said yes, asked him if he had a knife. He did and he voluntarily gave it up. At the end of this conversation, the defendant volunteered an inculpatory statement and at that point all questioning ceased and he was given his *Miranda* warnings. There, as here, police had no certain idea a crime had been committed and were initially requesting defendant's help in an investigation. At the point when defendant volunteered a statement involving himself in a crime, he was given *Miranda* warnings. We again held that the initial questioning was not a custodial interrogation.

In *State v. Hill*, 294 N.C. 320, 240 S.E. 2d 794 (1978) the defendant was in jail on an unrelated charge and the police had no idea a crime had been committed in a distant county. The "interrogation" objected to was a chance remark made in idle conversation to a sheriff's deputy which placed defendant by his own admission in the county where the crime at trial had taken place. The deputy thought nothing of the remark until several days later when he was apprised of the crime in the other county. Again, we held such questioning was not custodial interrogation.

In all three cases, events occurring prior to the questioning involved primarily those routinely associated with investigations where police initially sought out a defendant only to gather infor-

mation about missing persons or known crimes. In all three cases the interrogation itself involved questioning by one or two police in an open-ended, nonthreatening manner. And in all three cases, the result of the interrogations was either to release the defendant or to arrest him only if the investigation had developed probable cause to do so.

While these fact patterns do not provide the exclusive definition of noncustodial interrogation, they do apply to the case *sub judice*. Here, prior to questioning, police were investigating a routine missing person report. Defendant was visited by one plainclothes detective in an unmarked car at defendant's place of work. The police did not know a crime had been committed. During questioning, defendant voluntarily entered the car and immediately gave an inculpatory statement. At that point, the detective ceased all questioning and took defendant to the station where he was given *Miranda* warnings. Furthermore, after giving his statements and posting bond on an unrelated charge, defendant was allowed to leave. Taking all these facts into consideration, at no point until defendant had made his inculpatory statement would a reasonable person have believed under the circumstances that his freedom of movement was restrained in any significant way so that he was "in custody."

Moreover, if Detective Clayton had not gone to the gas station to question defendant, he would have been sadly remiss in his duties. In the words of the Supreme Court in *Oregon v. Mathiason*:

> [P]olice officers are not required to administer *Miranda* warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect. *Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him "in custody."

429 U.S. at 495, 97 S.Ct. at 714, 50 L.Ed. 2d at 719. No error.

[3] Defendant next assigns as error the admission of testimony by an F.B.I. agent certified as an expert witness in the field of microscopic analysis of human hair. The witness testified that

hairs found on Mrs. Smith's sweater were blond head hairs from a Caucasian which had microscopic characteristics similar to head hairs taken from the defendant. On cross-examination this witness stated that although the hairs were similar, the number of characteristics they shared with the defendant's hair was "limited." Defendant argues that this testimony was of so little probative value it was erroneous to admit it. Defendant further asserts the error was prejudicial because the jury "no doubt" gave the evidence added weight as coming from an F.B.I. expert.

Generally evidence is relevant if it has *any* logical tendency, however slight, to prove a fact in issue in the case. *State v. Banks*, 295 N.C. 399, 245 S.E. 2d 743 (1978); *State v. Swift*, 290 N.C. 383, 226 S.E. 2d 652 (1976); *State v. Arnold*, 284 N.C. 41, 199 S.E. 2d 423 (1973); 1 Stansbury, N.C. Evidence § 77 at 234 (Brandis rev. ed. 1973 & Cum. Supp. 1979). On the other hand, evidence which has no tendency to prove a fact in issue in the case is inadmissible. *Hensley v. Ramsey*, 283 N.C. 714, 199 S.E. 2d 1 (1973); *State v. Gaines*, 283 N.C. 33, 194 S.E. 2d 839 (1973); *State v. Ferguson*, 280 N.C. 95, 185 S.E. 2d 119 (1971); 1 Stansbury, N.C. Evidence § 77 at 234 (Brandis rev. ed. 1973). In practical terms this means that the test for admissibility is necessarily elastic, *see, e.g., Bell v. Walker & Herrington*, 48 N.C. 320 (1856), 1 Stansbury, N.C. Evidence § 78 at 237, and involves a careful consideration of the objectionable evidence in light of other evidence admitted during the course of any particular trial.

The case of *State v. Barber*, 278 N.C. 268, 179 S.E. 2d 404 (1971) upon which the State relies is appositive. In *Barber*, as here, defendant protested the admission of expert testimony on hair fibers. There the expert testified that hair taken from a rape victim's bed and from the defendant were microscopically the same in all identifying characteristics and that the hair found at the scene of the rape could have come from the defendant. Speaking for the Court, Justice Moore held that such testimony was admissible for it was a "link in the chain proving that the crime was committed by a Negro and that that Negro was the defendant." 278 N.C. at 276-77, 179 S.E. 2d at 410.

Here, neither the victim nor the defendant was black so that the possible pool of persons who could have left a hair on Mrs. Smith's sweater was much larger than that in *Barber*. And here

the expert noted that the microscopic characteristics were similar but "limited" while in *Barber* the expert was positive all characteristics were identical. However, in light of the other links in the chain of evidence offered at trial, including evidence which placed defendant in the presence of the victim at the time she disappeared, evidence which indicated the defendant's gun was the murder weapon and evidence which showed that someone with defendant's blood type raped Mrs. Smith, we cannot say that the connection between the testimony of the expert and the fact that his testimony tended to place the defendant in the presence of the victim at the time of her death was a connection so remote, latent or conjectural as to render it inadmissible. This assignment of error is overruled.

[4] Defendant finally argues that his indictment for first degree rape did not charge all the necessary elements of that crime as it is defined by G.S. 14-21(1). This problem has twice come before this Court. In *State v. Goss*, 293 N.C. 147, 235 S.E. 2d 844 (1977), and *State v. Perry*, 291 N.C. 586, 231 S.E. 2d 262 (1977), we held that where, as here, an indictment for first degree rape fails to allege that the defendant was older than sixteen or that the defendant used a deadly weapon or inflicted serious bodily injury, the indictment fails to allege all the essential elements of the crime of first degree rape and cannot support a conviction of that crime.

In those cases, as in this one, however, evidence presented at trial tended to prove the perpetration of a brutal and vicious rape by an adult defendant. In such event, we held in Goss, *supra*, and Perry, *supra*, and hold again today that the indictment is sufficient to support conviction for the crime of second degree rape which is statutorily defined: "Any other offense of rape . . . shall be a lesser included offense of rape in the first degree."

We are not unmindful that the General Assembly has provided for a shortened form of rape indictment in G.S. 15-144.1 which would cure the defect here. However, that statute only became effective on 1 July 1977, some three months after defendant was indicted and several weeks after he was convicted. The statute therefore has no application here.

The punishment for rape in the second degree is provided by G.S. 14-21(2) to include life imprisonment or imprisonment for a

term of years, in the court's discretion. That court, of course, is the trial court, not this Court. We therefore remand this case to the Superior Court of Durham County and direct that court to bring defendant before it and enter a verdict of guilty of second degree rape in lieu of the verdict now of record, and to sentence the defendant for that offense in the discretion of the court.

In Cases No. 77-CRS-7824, 77-CRS-7825 and 77-CRS-6070, no error.

In Case No. 77-CRS-7827, judgment vacated, and case remanded for correction of verdict and imposition of proper sentence.

Justice BROCK took no part in the consideration or decision of this case.